THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9    MARIA J. MORALES,                    CASE NO. C12-2235-JCC

10                      Plaintiff,        ORDER

11           v.

12    SONYA FRY, *et al.*,

13                      Defendants.

14

15        This matter comes before the Court on the motion for summary judgment of Defendants

16   Sonya Fry, Brian Rees, and Michelle Gallegos ("Officer Defendants") (Dkt. No. 55), the City of

17   Seattle's motion for summary judgment (Dkt. No. 52), and Plaintiff Maria Morales' motion for

18   partial summary judgment against Officer Sonya Fry (Dkt. No. 43). Having thoroughly

19   considered the parties' briefing and the relevant record, the Court finds oral argument

20   unnecessary and hereby GRANTS IN PART and DENIES IN PART the Officer Defendants'

21   motion for summary judgment (Dkt. No. 55), DENIES Plaintiff's motion for partial summary

22   judgment (Dkt. No. 43), and GRANTS IN PART and DENIES IN PART the City of Seattle's

23   motion for the reasons explained herein.

24   **I.    BACKGROUND**

25        This case arises out of the arrest and aborted prosecution of Ms. Maria Morales. On May

26   1, 2012,  Ms. Morales attended a "May Day" march in downtown Seattle, Washington. As the

day progressed, the march turned from a peaceful rally into a large demonstration that spanned downtown. Property was damaged and the protesters became difficult for SPD officers to effectively manage in the course of the day. Around 4:00 p.m., Ms. Morales and others witnessed police officers arrest an individual—later identified as Paul Campiche—who the officers believed to have thrown a bottle and attempted to run away from SPD officers. (Dkt. Nos. 46 at ¶ 10; 49 at ¶ 4.) To prevent other protesters from interfering with Mr. Campiche's arrest, SPD officers formed a bicycle circle around the arresting officers and Mr. Campiche as a barrier. (*Id.*; *see* Dkt. No. 50-4, Ex. D.) SPD officers were trained to form such circles to prevent protesters from interfering with arrests and did so numerous times on May 1, 2012. The officers at this scene also directed protesters to move in various directions in order to clear individuals away from the ongoing arrest. (Dkt. Nos. 46 at ¶ 10; 50-3 at 6.)

     Officer Sonya Fry was one of the officers who created the bicycle fence surrounding Mr. Campiche. She placed her police bicycle between herself and individuals watching the arrest, who included protesters and members of the news media. (*See* Dkt. No. 59 at ¶ 7.) Officer Fry stated in her deposition that at that time, she did not witness the individuals near her being physical or physically attacking officers. (Dkt. No. 50-4 at 10 (describing the crowd that day as "agitated and screaming and yelling" but admitting that no protesters were physically attacking officers or doing anything physical).) At the time just before Ms. Morales' arrest occurred, Officer Fry ordered protesters to move in a westward direction; other officers ordered the same group of individuals to move in a different direction, resulting in some confusion amongst the individuals. (Dkt. Nos. 46 at ¶ 10; 50-3 at 6.)  Ms. Morales was, like the other members of the public who witnessed Mr. Campiche's arrest, directed to move westward by Officer Fry. Ms. Morales passed immediately next to Officer Fry as she moved westward. Up to this point, Officer Fry had not seen Ms. Morales or taken note of any of Ms. Morales' conduct that day—Ms. Morales was simply another individual in the crowd. (*See* Dkt. No. 50-4 at 11.)

//

1    As Ms. Morales passed, Officer Fry suddenly and forcefully pulled Ms. Morales by her

2    head and shoulders over the bicycle fence, causing her to land backwards on the concrete and on

3    top of a bicycle. (*See* Dkt. No. 50-1.) According to Ms. Morales, she had very little room to pass

4    by Officer Fry's bicycle due to the number of people confined in the tight space between the

5    bicycle fence line and a wall behind the protesters. (Dkt. Nos. 46 at ¶ 11–12; 56-3 at 44.) In order

6    to pass and continue obeying Officer Fry's directive to proceed westward, Ms. Morales states,

7    she moved the handlebars of Officer Fry's bike. (Dkt. No. 56-3 at 44.) Another individual, Nigel

8    Pendley, was standing immediately next to Ms. Morales. Mr. Pendley also states that there was

9    very little room for the protesters to pass Officer Fry's bike, and that if Ms. Morales had not

10   moved the handlebars, he would have had to do so. (Dkt. No. 50-3 at 9–12.) Mr. Pendley

11   recorded the encounter on video. (*See* Dkt. No. 50-1.) The video clip, however, did not surface

12   until after Ms. Morales had been arrested and charged with assault based upon Officer Fry's

13   description of the incident.

14   According to Officer Fry's arrest report, which she drafted shortly after the arrest, Officer

15   Fry pulled Ms. Morales over the bicycle line and arrested her for assaulting a police officer.

16   (Dkt. No. 50-5.) Officer Fry stated in that report that in front of her were photographers and

17   members of the news media documenting an individual's arrest. (*Id.*) She stated that Ms.

18   Morales began yelling at officers in the bicycle line when Officer Fry verbally requested that

19   everyone move back. (*Id.*) At that point, Officer Fry stated,  Ms. Morales yelled "Okay Bitch!"

20   "less than one arm  length away from [her] face" and "punched [her] in the chest with a closed

21   fist." (Dkt. No. 50-5.) The report also states that Ms. Morales "struggled to get free by kicking

22   officers" once she was on the ground. (*Id.*) Officer Fry made no mention in the report about

23   either the movement of or impact from her bicycle handles allegedly caused by Ms. Morales.

24   Subsequently, Officer Fry hedged from this position in her deposition and in her

25   supporting declaration. She explained that she did not actually see Ms. Morales punch her, but

26   merely felt an impact from an unknown source in her chest area. (*See* Dkt. Nos. 50-4 at 13; 59 at

¶ 11.) She assumed that Ms. Morales must have punched her because, Officer Fry stated, Ms. Morales was the closest person to her at the time. (Dkt. Nos. 50-4 at 23–24; 59 at ¶ 11.) Officer Fry also conceded in her deposition that she did not see Ms. Morales say "Okay Bitch!" just before allegedly punching her, and does not recall whether Ms. Morales made that statement said it in a high or low voice. (Dkt. No. 50-4 at 22.) Notably, one cannot hear Ms. Morales utter the alleged statement to Officer Fry or otherwise see her punch Officer Fry in the video of the arrest. (*See* Dkt. No. 50-1.) Mr. Pendley also states that he did not hear Ms. Morales say "Okay Bitch!" or see her punch Officer Fry. (Dkt. No. 49 at ¶¶ 7–8.) Finally, Officer Fry conceded in her deposition that she did not see Ms. Morales move her bicycle handle, cannot recall whether her bicycle impacted her, and did not actually see Ms. Morales kick any of the officers as her report had stated. (Dkt. Nos. 50-4 at 15, 26.)

Officer Fry pulled Ms. Morales over the bicycle fence line by her head and shoulders. Ms. Morales' body turned while falling, and she ultimately landed on her back on the concrete and on top of a bicycle. Officers Rees, Gallegos, Fry, and one other officer converged upon Ms. Morales, who states that she was moving after she hit the ground in an attempt to get space from the officers since she had been abruptly attacked. (Dkt. Nos. 46 at ¶¶ 12–13; 56-3 at 71–72.) The officers state that Ms. Morales was resisting arrest. (*See* Dkt. No. 59 at ¶ 14.) After Ms. Morales landed on the ground, Officer Gallegos assisted with the arrest. Officer Gallegos states that she stepped on Ms. Morales' leg or foot in order to get her upper body on the ground. (Dkt. No. 60 at ¶ 23.) Officer Gallegos also alleged after the incident that Ms. Morales deliberately kicked her in the leg, and told the officers at the prisoner processing van to add a second charge of assault against Ms. Morales. (*Id.* at ¶ 24.) No further acts by Officer Gallegos are discussed.

In the moments after Ms. Morales was pulled inside of the bicycle circle—while multiple officers surrounded her—Officer Brian Rees dispersed his pepper spray in Ms. Morales' face and onto her shoulder. (Dkt. Nos. 46 at ¶ 13; 61 at ¶ 5.) The dispersal was brief—a fraction of a second—and also contacted Officer Gallegos, but all parties agree that pepper spray was

dispersed and that it made contact with Ms. Morales' face. Officer Rees states that his use of the pepper spray was accidental, and stated on a previous occasion that he did not even know that he had dispersed his pepper spray until told that he did so afterwards. (Dkt. No. 61 at ¶ 5.) His accounts of his use of pepper spray have also been inconsistent as time as passed from May 1, 2012 to the date of this lawsuit. (*See* Dkt. No. 67 at 18–23.) Like Ms. Morales' initial arrest, Officer Rees' action was also recorded on video. (Dkt. No. 69.) That clip shows Officer Rees extending his right arm with his pepper spray directly towards Ms. Morales' shoulder and face, and the pepper spray being dispersed. (*Id.*) After the pepper spraying occurred, Officer Rees assisted in handcuffing and subduing Ms. Morales. Ms. Morales was ultimately handcuffed with two pair of handcuffs that she alleges were tightened in a manner that caused her pain and injured her thumb.(Dkt. Nos. 21 at ¶ 24; 46 at ¶ 13.) Officers also bent Ms. Morales' legs against her buttocks and put their knees against her back while she was lying face first on the ground to prevent her from resisting arrest. After being handcuffed, Ms. Morales was led further down the street to the SPD processing van and was ultimately transported to a holding cell. (Dkt. No. 46 at ¶¶ 14–16.)

On May 17, 2012, Ms. Morales was charged with Assault in the Fourth Degree. (*Id.*, Ex. A.) At some point after the May Day demonstration, Mr. Pendley's video of Ms. Morales' arrest was posted on the Internet. Ultimately, the King County Prosecutor's Office requested that all charges against Ms. Morales be dismissed and on August 17, 2012, the presiding King County judge dismissed the state's case against Ms. Morales with prejudice in the interest of justice. (*Id.*, Ex. B.) According to Defendants, the Seattle Police Department thereafter conducted two separate investigations into the officers' use of force against Ms. Morales. The first was a standard use of force investigation that is conducted after all uses of force; the second was an Internal Affairs ("OPA") investigation prompted by the complaint of an uninvolved third party who found Mr. Pendley's video on the Internet. (*See* Dkt. No. 62 at ¶ 55.) The investigations found that probable cause existed to arrest Ms. Morales, but Officer Rees was given a training

1    referral for the "accidental" use of his pepper spray. (Dkt. No. 54-1.)

2          This lawsuit followed Ms. Morales' arrest and prosecution. She brings claims the

3    following claims[1]: (1–2) § 1983 unlawful arrest and excessive force claims against Officers Fry,

4    Gallegos, and Rees; (3) a § 1983 malicious prosecution claim against all defendants; (4) a § 1983

5    *Monell* claim against the City of Seattle; (5–8) state law assault, battery, false arrest, and

6    malicious prosecution claims against all defendants; and (9) a *respondeat superior* claim against

7    the City of Seattle. (Dkt. No. 21.) Now before the Court are the following motions: (1) Plaintiff's

8    motion for partial summary judgment against Officer Fry on her § 1983 unlawful arrest,

9    excessive force, and malicious prosecution claims; (2) the Officer Defendants' motion for

10   summary judgment on all claims; and (3) the City of Seattle's motion for summary judgment on

11   all municipal liability claims. The Court addresses each motion below.

12   **II.    DISCUSSION**

13        **A.    Summary Judgment Standard**

14        Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant

15   summary judgment if the movant shows that there is no genuine dispute as to any material fact

16   and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In making such

17   a determination, the Court must view the facts and inferences to be drawn therefrom in the light

18   most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50

19   (1986). Once a motion for summary judgment is properly made and supported, the opposing

20   party "must come forward with specific facts showing that there is a genuine issue for trial."

21   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Material facts are

22   those that may affect the outcome of the case, and a dispute about a material fact is genuine if

23   there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.

24   *Anderson*, 477 U.S. at 248–49. Ultimately, summary judgment is appropriate only against a party

25   _____

26        [1] The claims listed here do not include those against defendants who were previously dismissed.

1    who "fails to make a showing sufficient to establish the existence of an element essential to that

2    party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.*

3    *Catrett*, 477 U.S. 317, 324 (1986).

4         **B.**        **Plaintiff's § 1983 Claims and the Officers' Qualified Immunity Motion**

5         "Qualified immunity shields government officials from civil damages liability unless the

6    official violated a statutory or constitutional right that was clearly established at the time of the

7    challenged conduct." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 824 (9th Cir. 2013) (citing

8    *Reichle v. Howards*, --- U.S. ---, 132 S. Ct. 2088, 2093 (2012)). Ultimately, "[a]ssessing whether

9    an official is entitled to immunity is a two prong inquiry[,]" and the Court may address the

10   prongs in whichever order it deems appropriate under the circumstances. *Id.* Under the first

11   prong, the Court determines whether, "[t]aken in the light most favorable to the party asserting

12   the injury, [] the facts alleged show [that] the officer's conduct violated a constitutional right[.]"

13   *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Under the second prong, the Court

14   determines whether the right allegedly violated was "clearly established." To be clearly

15   established, "the contours of the right must be sufficiently clear that a reasonable official would

16   understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton*, 483

17   U.S. 635, 639 (1987)). Here, the Officer Defendants—Officers Fry, Rees, and Gallegos—each

18   move for summary judgment. They argue that they committed no constitutional violations and

19   that even if the Court finds that violations occurred, they are each entitled to qualified immunity.

20   (Dkt. No. 55.) The Court addresses the arguments, which necessarily encompass an analysis of

21   Plaintiff's motion for partial summary judgment on Officer Fry's liability, in turn.[2]

22   //

23   //

24

25

26       [2] The Court construes the facts in the light most favorable to Ms. Morales for purposes of Defendants' motions for summary judgment. Conversely, the Court considers the facts in the light most favorable to Officer Fry for purposes of addressing Ms. Morales' summary judgment motion.

1           **1.      Plaintiff's Unlawful Arrest Claim Under § 1983**

2           The Court begins with Ms. Morales' claim that the officers arrested her without probable

3   cause. The Fourth Amendment protects individuals against "unreasonable searches and

4   seizures." U.S. Const. amend. IV. A warrantless arrest, which constitutes a "seizure," is

5   "unreasonable" and thus unconstitutional if it is not supported by probable cause—*i.e.*, if "the

6   facts and circumstances within [the arresting officer's] knowledge are [not] sufficient for a

7   reasonably prudent person to believe that the suspect has committed a crime." *Rosenbaum v.*

8   *Washoe County*, 663 F.3d 1071, 1076 (9th Cir. 2011). Thus, to prevail on a § 1983 claim for

9   false arrest, a plaintiff must demonstrate that based on the facts known to the officer at the time

10  of the arrest, there was no probable cause to arrest her. *Norse v. City of Santa Cruz*, 629 F.3d

11  966, 978 (9th Cir. 2010) (en banc). "[P]robable cause does not exist where a police officer arrests

12  an individual for activities that do not constitute a violation of the law." *Beier v. City of*

13  *Lewiston*, 354 F.3d 1058, 1065–66 (9th Cir. 2004).

14          The Ninth Circuit has summarized the requisite qualified immunity analysis in the

15  context of a false arrest claim. The Court first determines whether there was probable cause for

16  the arrest, without which the arrest is unconstitutional. *Rosenbaum*, 663 F.3d at 1076. Even if an

17  unconstitutional arrest occurred, however, an officer may still be entitled to qualified immunity if

18  "it is *reasonably arguable* that there was probable cause for arrest—that is, whether reasonable

19  officers could disagree as to the legality of the arrest such that the arresting officer is entitled to

20  qualified immunity." *Rosenbaum*, 663 F.3d at 1076 (emphasis in original); *see Norse*, 629 F.3d

21  at 978 ("a government official is entitled to qualified immunity on a false arrest claim if a

22  reasonable officer in his position could have believed that probable cause existed"). Ultimately,

23  the "linchpin of qualified immunity analysis is the reasonableness of the officer's conduct."

24  *Rosenbaum*, 663 F.3d at 1076. For the reasons explained below, the parties' conflicting

25  accounts—and thus, disputed issues of material fact—preclude the Court from determining

26  whether probable cause existed to arrest Ms. Morales and whether the Officer Defendants are

1   entitled to qualified immunity on Ms. Morales' unlawful arrest claim.

2                       **a.**      **Officer Fry**

3       *Assault*. Here, Officer Fry arrested Ms. Morales for assaulting a police officer.[3] She

4   argues in her brief that probable cause existed to arrest Ms. Morales for "assault in the third

5   degree." Under Washington law, "[a] person is guilty of assault in the third degree if he or she . .

6   . [a]ssaults a law enforcement officer . . . who was performing his or her official duties at the

7   time of the assault." RCW § 9A.36.031(1)(g). "Assault" is not defined in the statute, but

8   Washington courts recognize three definitions of the term: "(1) an unlawful touching (actual

9   battery); (2) an attempt with unlawful force to inflict bodily injury upon another, tending but

10   failing to accomplish it (attempted battery); and (3) putting another in apprehension of harm."

11   *State v. Abuan*, 161 Wn. App. 135, 154 (2011) (quoting *State v. Elmi,* 166 Wash.2d 209, 215

12   (2009)). "In order to commit assault, a person must have specific intent to cause bodily harm or

13   to create an apprehension of bodily harm." *State v. Williams,* 244 P.3d 1018, 1022 (Wash. Ct.

14   App. 2011).

15       Genuine issues of material fact preclude a determination that probable cause existed to

16   support Ms. Morales' arrest for assault in the third degree. Construing the facts in Plaintiff's

17   favor—which the Court must do for purposes of Defendants' qualified immunity motion, *see*

18   *Acosta*, 718 F.3d at 824—the facts known to Officer Fry when she decided to arrest Ms. Morales

19   included the following: Officer Fry, while looking away and directing unknown members of a

20   crowd to move westward, allegedly felt an "impact" from an unknown source, and Officer Fry

21   assumed it was Ms. Morales because she was "within striking distance" when Officer Fry turned

22   toward Ms. Morales. Whether this established probable cause depends solely on whether a juror

23

24

25

26

[3] Officer Fry suggests in her brief that probable cause also existed to arrest Ms. Morales for "Riot" and for Assault in the Fourth Degree. But Defendant chose not to further discuss or brief those possibilities, deciding instead to "focus" only on Third Degree Assault and Obstruction. In light of Defendant's choice, the Court focuses only on the same.

1    credits this account or instead finds that Officer Fry is not truthfully recounting what happened,

2    which a reasonable juror could do in light of Officer Fry's inconsistent account in her police

3    report. Furthermore, even if Officer Fry's "unknown impact" statement is credited, a reasonable

4    juror could easily conclude that she lacked probable cause.

5         According to Ms. Morales, she did not punch Officer Fry, did not say "Okay Bitch!" as

6    she was passing, and moved Officer Fry's bicycle handles only so she could pass by given the

7    crowded nature of the path.[4] Further, Officer Fry herself conceded in her deposition (contrary to

8    her police report immediately following the incident) that she did not see Ms. Morales punch her,

9    does not actually know whether Ms. Morales said "Okay Bitch!" just before allegedly hitting her,

10   and could not recall seeing Ms. Morales move the handlebars or otherwise feeling an impact

11   from the handlebars. In light of these facts (which are construed in Ms. Morales' favor), there

12   were no facts to support Officer Fry's determination that Plaintiff punched Officer Fry with

13   intent to cause or create an apprehension of harm.[5] And at a minimum, Officer Fry's argument

14   would require the Court to find credible her testimony that she felt an "impact" and that Ms.

15   Morales was the *only* person within striking distance. But the Court cannot judge Officer Fry's

16   credibility on a motion for summary judgment given Ms. Morales' clear denial of ever punching

17   or causing an "impact" to Officer Fry's chest area. The jury will have the opportunity to hear the

18   parties' varying accounts of the incident, and will be tasked with resolving the credibility of each

19   witness. Only then can the fact-finder determine whether probable cause existed given the

20   parties' competing accounts.

21   _____

22        [4] Defendant confusingly focuses on the fact that Ms. Morales moved the handlebars as a basis for finding
23   probable cause. However, Officer Fry stated in her deposition that she did not see Ms. Morales move the handlebars
     and does not recall if the bike impacted her. In light of these concessions, the Court cannot find as a matter of law
24   that probable cause existed based on the "handlebars" movement because the evidence does not demonstrate that
     Officer Fry knew of these facts at the time she arrested Ms. Morales.

25        [5] To the extent Officer Fry suggests that probable cause existed to arrest Ms. Morales because, in hindsight,
26   it can be demonstrated that Ms. Morales moved the handlebars with such force so as to impact Officer Fry, the Court
     does not find this to support probable cause for Ms. Morales' arrest. Probable cause must be based on facts known to
     Officer Fry at the time of the arrest, not after-the-fact speculation about what did or did not actually happen.

ORDER
PAGE - 10

1    If Officer Fry's version of the events is credited, however, and the Court accepts that Ms.

2    Morales punched her in the chest while saying "Okay Bitch!"—and discredits Ms. Morales'

3    testimony that she did not punch Officer Fry—a reasonable juror could conclude that probable

4    cause existed to arrest her for assault. That is a determination for the jury to make rather than the

5    Court.

6    Finally, if Ms. Morales' version of the facts is accepted, no reasonable police officer

7    would have had a basis to arrest Ms. Morales. The reason, of course, is that Officer Fry had no

8    factual basis to believe Ms. Morales had committed a crime. See, *e.g.*, *Yanni v. City of Seattle*,

9    No. C04-0896, 2005 WL 1288017, at *6 (W.D. Wash. May 2, 2005) (denying qualified

10   immunity on unlawful arrest claim where, on plaintiff's version of the facts, plaintiff had not

11   assaulted the officer).The Court thus concludes that Ms. Morales has properly alleged a

12   constitutional violation and that qualified immunity is not warranted for Officer Fry in light of

13   disputed factual issues. Both Officer Fry's and Ms. Morales' motions for summary judgment are

14   denied as to this claim.

15   *Obstruction*. Officer Fry next asserts that probable cause existed to arrest Ms. Morales for

16   "obstructing a police officer." Under Washington law, "[a] person is guilty of obstructing a law

17   enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement

18   officer in the discharge of his or her official powers or duties." RCW § 9A.76.020; *see also*

19   Seattle Municipal Code § 12A.16.010 ("a person is guilty of obstructing a public officer if, with

20   knowledge that the person obstructed is a public officer, he or she[] [i]ntentionally and

21   physically interferes with a public officer"). Officer Fry's counsel argues in passing that Officer

22   Fry was working as part of a bicycle fence line and attempting to disperse a "difficult and hostile

23   crowd" when Ms. Morales "intentionally pushed [her] handlebars[.]" (Dkt. No. 55 at 16.) Thus,

24   counsel concludes, "[p]utting hands on [her] bicycle and pushing was obstruction as it physically

25   interfered with the bicycle fence line and the officers' attempts to control the crowd." (*Id.*)

26   //

ORDER
PAGE - 11

1    The Court is not persuaded. As noted above, Officer Fry conceded in her own deposition

2    that she could not recall if Ms. Morales moved the handlebars or if the handlebars made contact

3    with her body. Nor did Officer Fry's arrest report, which she drafted the same day as the

4    incident, mention anything whatsoever about Ms. Morales pushing her bicycle handlebars. There

5    is thus no basis to conclude that Officer Fry knew, at the time of the incident, that Ms. Morales

6    moved the handlebars in order to obstruct her efforts to disperse the crowd. Additionally, Officer

7    Fry's conclusory assertion ignores the facts as construed in Ms. Morales' favor, which

8    demonstrate that Plaintiff moved the handlebars so that she could obey Officer Fry's order and

9    continue moving west. Indeed, the video evidence demonstrates that Ms. Morales in fact had

10   moved from east to west in the video frame when Officer Fry decided to arrest Plaintiff. Even

11   though Plaintiff concededly moved the handlebars to get by, that alone would not have

12   provided Officer Fry a basis to find that Ms. Morales either intentionally or willfully—*i.e.*,

13   knowingly—hindered, delayed, obstructed, or interfered with Officer Fry in the discharge of her

14   duties (if she had realized as much). Nor could the Court conclude on these facts that Ms.

15   Morales actually hindered, delayed, or otherwise obstructed Officer Fry in the performance of

16   her duties, since her arrest occurred approximately one or two seconds after the handlebars were

17   moved. The Court finds Defendant's arguments to be unpersuasive.

18   Additionally, on the facts known to Officer Fry at the time of arrest (construed in Ms.

19   Morales' favor), no reasonable officer in Officer Fry's position—*i.e.*, directing individuals to

20   move west—would conclude that an individual who moved a bicycle handle to pass in a

21   concededly tight space, while obeying the orders to move west, willfully hindered, delayed, or

22   obstructed Officer Fry. Defendant is not entitled to qualified immunity at this stage. Instead, the

23   jury will be required to resolve the disputed factual issues and determine whether probable cause

24

25

26

ORDER
PAGE - 12

existed.[6]

### b.      Officer Rees and Officer Gallegos

In their motion for summary judgment, Officers Rees and Gallegos assert qualified immunity with regard to Ms. Morales' unlawful arrest claim. They argue they were not required to independently determine probable cause because they merely assisted in an ongoing arrest. At a minimum, they argue, they acted reasonably in relying on Officer Fry's basis to arrest Ms. Morales for assault because they made a split-second decision to assist a fellow officer. In response, Plaintiff does not address Officers Rees' or Gallegos' liability for unlawful arrest. In light of Plaintiff's failure to address this argument and the fact that Officers Rees and Gallegos acted in reliance on Officer Fry's judgment and basis for arrest in assisting with Ms. Morales' detainment, the Court agrees that qualified immunity is appropriate for these officers on the unlawful arrest claim.

### 2.      Plaintiff's Malicious Prosecution Claim Under § 1983

A claim of malicious prosecution is generally not cognizable under § 1983 if process is available within the state judicial system to provide a remedy. *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1983) (en banc). However, the Ninth Circuit has enunciated an important exception to this general rule. *Lacey v. Maricopa Cty.*, 649 F.3d 1118, 1133 (9th Cir. 2011). A plaintiff can prevail on a federal malicious prosecution claim if she shows "that the defendants prosecuted [her] with malice and without probable cause, and that they did so for the purpose of denying [her] equal protection or another specific constitutional right." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)). As the Ninth Circuit has held, "[a] police officer who maliciously or recklessly makes false reports to the prosecutor may be held liable for damages incurred as a

---

[6] For the same reason discussed with regard to probable cause to arrest for assault—namely, that the Court must credit Officer Fry's assertion that she was punched by Ms. Morales—the Court denies Plaintiff's motion for summary judgment on the obstruction issue as well.

proximate result of those reports." *Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007); *see Awabdy*, 368 F.3d at 1066 (section 1983 malicious prosecution claim can be brought not only against prosecutors, but "against other persons who have wrongfully caused the charges to be filed.").

Here, disputed issues of fact preclude a ruling for either Plaintiff or Officer Fry on the malicious prosecution claim. As discussed above, the Court cannot resolve whether probable cause existed on the current record. Additionally, there exists disputed issues of fact that preclude the Court from determining whether Officer Fry acted with malice in allowing the prosecution to go forward.[7] For example, a reasonable juror could conclude that Officer Fry's arrest report was recklessly drafted and inaccurate depending on whether that juror credits or discredits Officer Fry's live testimony and in light of the remaining evidence. However, a reasonable juror could also agree with Officer Fry that while her report was not perfect, it was not sufficiently reckless or patently false so as to warrant liability for a malicious prosecution claim. These interpretations will depend on how the jurors receive the witnesses' testimony in this matter. Accordingly, both Officer Fry's and Ms. Morales' motions are denied on this point.

To the extent Plaintiff seeks to bring her malicious prosecution claim against Officers Rees and Gallegos, she has provided no evidence of their direct participation in causing the charges to be filed. *See Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) (plaintiff must show that officer personally participated in the alleged deprivation of rights in order for officer to be liable under § 1983). Nor has Ms. Morales argued against summary judgment for Officers Rees and Gallegos on her malicious prosecution claim. Accordingly, Defendants' motion is granted on this claim as to Officers Gallegos and Rees.

//

---

[7] Plaintiff repeatedly argues that a lack of probable cause necessarily demonstrates malice. Malice *may* be inferred under the circumstances by an official's decision to proceed without probable cause, but they are not mechanically intertwined. Malice and a lack of probable cause are separate elements of a malicious prosecution claim, and the Court declines to do away with well-established Ninth Circuit law on this point.

ORDER
PAGE - 14

1      ### 3.      **Plaintiff's § 1983 Excessive Force Claim**

2      Next, the Officer Defendants argue that the force used was objectively reasonable and

3 assert qualified immunity with regard to Plaintiff's excessive force claim. Conversely, Plaintiff

4 moves for summary judgment as to Officer Fry's liability on the same. In the Ninth Circuit,

5 courts "analyze all claims of excessive force that arise during or before arrest under the Fourth

6 Amendment's reasonableness standard[.]" *Coles v. Eagle*, 704 F.3d 624, 627 (9th Cir. 2012)

7 (citing *Graham v. Connor*, 490 U.S. 386 (1989)). "[T]he 'reasonableness' inquiry in an excessive

8 force case is an objective one:  the question is whether the officers' actions are 'objectively

9 reasonable' in light of the facts and circumstances confronting them, without regard to their

10 underlying intent or motivation." *Graham*, 490 U.S. at 397. The reasonableness' of a particular

11 use of force must be judged from the perspective of a reasonable officer on the scene, rather than

12 with 20/20 vision in hindsight. *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001) (citing

13 *Graham*, 490 U.S. at 396).

14      To determine whether an officer used excessive force, the nature and quality of the

15 intrusion must be weighed against the countervailing governmental interest in the use of that

16 force. *Id.* The Court considers the following factors in its analysis: (1) the severity of the crime

17 or situation to which the officer was responding; (2) whether the plaintiff posed an immediate

18 threat to the safety of the officer or others; (3) whether the plaintiff was actively resisting arrest

19 or attempting to evade arrest by flight; (4) the amount of time and any changing circumstances

20 during which the officer had to determine the type and amount of force that appeared to be

21 necessary; and (5) the availability of alternative methods to subdue the plaintiff. *Smith v. City of*

22 *Hemet,* 394 F.3d 689, 701 (9th Cir. 2005); *see Graham*, 490 U.S. at 397. Because the balancing

23 of these factors "nearly always requires a jury to sift through disputed factual contentions, and to

24 draw inferences therefrom . . . summary judgment [] in excessive force cases should be granted

25 sparingly." *Coles*, 704 F.2d at 628.

26 //

1

### a.   Officer Fry's Use of Force

2       The nature and quality of Officer Fry's intrusion on Ms. Morales' rights is clearly

3   captured on video. It is undisputed that Officer Fry pulled Ms. Morales by the head and neck

4   over her bicycle without warning and slammed her on her back onto bare concrete and two

5   bicycles. Thereafter, Officer Fry and other officers surrounded Ms. Morales, bent her arms and

6   legs to subdue her, double handcuffed her, and at one point, Officer Brian Rees briefly sprayed

7   Ms. Morales in the face with pepper spray. In the Court's view, the force used to pull Ms.

8   Morales over the bicycle fence and down to the ground, while serious and unsurprisingly painful

9   for a victim, is not of the type that courts generally regard as "intermediate force." No weapons

10  such as tasers or batons were used; instead, Ms. Morales was forcefully dragged to the ground

11  over a bicycle fence. This use of force must nonetheless be weighed against the need for such

12  force. Plaintiff asserts that because probable cause was lacking, the use of any such force was

13  unreasonable.

14      While the Court finds that the use of force is not of the "exceptional" type, a jury

15  determination is necessary to determine whether the force was reasonable in light of the *Graham*

16  factors.[8] First, the crime with which Ms. Morales was charged—and the commission of which is

17  hotly disputed—is not sufficiently serious to justify a serious use of force. It appears clear to the

18  Court that Ms. Morales, as an unarmed, relatively small individual, posed no serious threat to

19  Officer Fry, especially given the numerous officers immediately surrounding Ms. Morales and

20  Officer Fry. Further, at the time Officer Fry pulled Ms. Morales over the bicycle fence and

21  slammed her to the ground, Ms. Morales was not actively resisting arrest or attempting to evade

22

---

23      [8] To the extent Defendants rely on *Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir. 2001) to argue that

24  their force was objectively reasonable as a matter of law, the Court disagrees. In *Jackson*, it was undisputed that the
    plaintiff had directly interfered with a police officer's attempted arrest and been warned that a chemical irritant

25  would be used. When she continued to interfere with the officer's arrest, she was pepper sprayed in her hair and
    arrested. Unlike *Jackson*, the parties dispute whether Ms. Morales engaged in *any* conduct that would warrant arrest,
    had not been warned that she would be taken down and/or sprayed with pepper spray, and was not part of a violent

26  group otherwise interfering with Officer Fry. Given the factual differences between this case and *Jackson*, the Court
    is not prepared to deprive Ms. Morales of her day in Court.

1    arrest by flight—she was obeying Officer Fry's directive to move westward and the commission

2    of any crime is subject to direct dispute. Indeed, Officer Fry gave no warning  before pulling Ms.

3    Morales to the ground. Undoubtedly, May Day was a hectic situation for SPD officers—and the

4    Court does not ignore the day's circumstances—but Officer Fry herself stated that no protesters

5    in her immediate vicinity were being physical with the officers. Finally, the Court takes note of

6    the multiple officers that were available to assist in Ms. Morales' arrest without so forcefully

7    bringing her to the ground without warning.

8           Given the circumstances of Ms. Morales' arrest and the way in which she was taken to

9    the ground, a reasonable juror could determine that Officer Fry's use of force was unreasonable.

10    To the extent Officer Fry argues that she is entitled to qualified immunity for her use of force,

11    the Court cannot agree. It was clearly established at the time of the events at issue in this case

12    that a law enforcement officer's use of force must be reasonable under all of the circumstances.

13    *See, e.g., Hammer v. Gross,* 932 F.2d 842, 846 (9th Cir. 1991).Thus, if the jury accepts Ms.

14    Morales' factual account and concludes that Officer Fry lacked probable cause to arrest her, the

15    jury could easily conclude that she used unreasonable force in violation of clearly-established

16    law. *See*, *e.g.*, *Dunn v. Hyra*, 676 F.  Supp. 2d 1172, 1191 (W.D. Wash. 2009) (denying qualified

17    immunity on excessive force claim where officers had used physical distraction techniques and

18    thrown individual against a tree even though, on plaintiff's version of the facts, there was no

19    basis to arrest him and no need for such force); *Holland v. King Cty. Adult Detention*, No. C12-

20    0791, 2013 WL 3354414, at *16 (W.D. Wash. July 3, 2013) (denying qualified immunity on

21    excessive force claim because "[w]hether the force utilized . . . in handcuffing [plaintiff] was

22    reasonable is too intertwined with whether [plaintiff]'s [arrest was] in violation of the Fourth

23    Amendment). Even if probable cause did exist for Ms. Morales arrest, the Court still believes

24    that under the facts construed in Ms. Morales' favor, a reasonable officer would have known that

25    the use of force was unlawful. Qualified immunity is not warranted for Officer Fry.

26    *//*

b.      **Officer Rees' Use of Force**

The nature and quality of the intrusion upon Ms. Morales' rights inflicted by Officer Rees

is also captured on video. Officer Rees, in the course of assisting Officer Fry and others with Ms.

Morales' arrest, briefly pepper sprayed Ms. Morales on her shoulder and the left side of her face.

Pepper spray is a form of force "capable of inflicting significant pain and causing serious injury.

As such, [it is] regarded as 'intermediate force' that, while less severe than deadly force,

nonetheless present[s] a significant intrusion upon an individual's liberty interest[]." *Young v.*

*Cty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (citation omitted). As explained by the

Ninth Circuit, "pepper spray is *designed* to cause intense pain, and inflicts a burning sensation

that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex,

and temporary paralysis of the larynx, as well as disorientation, anxiety, and panic." *Id.* (citing

*Headwaters Forest Defense v. Cty. of Humboldt*, 240 F.3d 1185, 1199–1200 (9th Cir. 2000)

*vacated and remanded on other grounds*, 534 U.S. 801 (2001)). Here, Officer Rees undisputedly

sprayed Ms. Morales, albeit for only a brief moment.[9] Even if the spray was only momentary, the

Court finds that the use of pepper spray constitutes a serious intrusion upon Ms. Morales'

rights.[10]

---

[9] Plaintiff alleged in her complaint that Officer Rees tightened her handcuffs such that they caused her pain and injured her thumb. Defendants then moved for summary judgment on this issue, and Plaintiff failed to address it in her opposition. Thus, while the tightening of handcuffs can in some circumstances constitute excessive force, *see Wall v. Cty. of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004) ("It is well-established that overly tight handcuffing can constitute excessive force."); *Palmer v. Sanderson*, 9 F.3d 1433, 1436–37 (9th Cir. 1993) (affirming denial of qualified immunity on excessive force claim where officers unnecessarily fastened handcuffs so tightly around suspect's wrists that they caused suspect pain and left bruises), Plaintiff's failure to provide any actual evidence to support this claim (or address it at all in her opposition) leaves the Court no choice but to grant summary judgment to Officer Rees on this aspect of Plaintiff's claim.

[10] Defendants argue in passing that because Officer Rees unintentionally deployed his pepper spray, there was no "seizure" for Fourth Amendment purposes. (Dkt. No. 55 at 21 (citing *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1986).) Such an argument is without merit. First, whether Officer Rees intentionally or unintentionally deployed his pepper spray in Ms. Morales' face is a hotly disputed issue of fact, as noted herein. (*See* Dkt. No. 67 at 20–23 (discussing facts that suggest Officer Rees intentionally deployed pepper spray).) Second, there is no serious dispute that Ms. Morales was subject to a seizure—she was being forcefully arrested by numerous officers, including Officer Rees, when he deployed his pepper spray. Upon review, *Brower v. Cty. of Inyo* provides no support to Defendants on this summary judgment motion.

1       The Court balances Officer Rees' use of force against the same factors discussed above.

2  Officer Rees was one of many police officers that took part in Ms. Morales' arrest, and he joined

3  the arrest after Ms. Morales had already been pulled inside of the bicycle circle—and thus, away

4  from any threat of protester interference—and surrounded by other officers. In light of the

5  multiple officers that could assist in completing Ms. Morales' arrest and the fact that Officer

6  Rees was not using his pepper spray in self-defense when he sprayed Ms. Morales, a reasonable

7  juror could easily conclude that his use of pepper spray constituted unreasonable force under the

8  circumstances. In making this determination, the jury will also be tasked with resolving disputed

9  issues of fact, such as whether Officer Rees' use of his pepper spray was accidental or intentional

10  and whether probable cause existed to arrest Ms. Morales at all. With regard to Officer Rees'

11  qualified immunity, the Court is satisfied that when the facts are construed in Ms. Morales'

12  favor, a reasonable police officer would know that it was unlawful to pepper spray an individual

13  who is already being subdued by multiple officers and who poses no serious threat to the

14  officers. Accordingly, the Court denies Defendants' motion for summary judgment as to

15  Plaintiff's excessive force claim against Officer Rees.

16             **c.**      **Officer Gallegos' Use of Force**

17       The Court's conclusion differs as to Officer Gallegos. The only force Officer Gallegos

18  used was to allegedly step on Ms. Morales leg in order to keep her down to the ground in the

19  course of the arrest. Officer Gallegos did not use any weapons, did not use pepper spray, and

20  unlike Officer Fry, did not forcefully bring Ms. Morales onto the ground. Her use of force, if it

21  caused any pain at all, resulted in the most minor of intrusions on Ms. Morales' rights. Given the

22  minor role she played and the fact that she was merely assisting an arrest that Officer Fry

23  initiated, Officer Gallegos acted reasonably under the circumstances. And even if her actions

24  were deemed unconstitutional, an officer in her position would not have known that merely

25  holding an individual down to assist an arrest constituted excessive force. Officer Gallegos is

26  entitled to qualified immunity on Plaintiff's excessive force claim.

4. **Plaintiff's State Law Claims**

i. **Malicious Prosecution**

In addition to her § 1983 malicious prosecution claim, Ms. Morales brings a claim for malicious prosecution under Washington law. To prevail on such a claim, she must plead and establish five essential elements: (1) that the prosecution was instituted or continued; (2) a want of probable cause; (3) malice; (4) favorable termination; and (5) damages. *Hanson v. Snohomish*, 121 Wn.2d 552 (Wash. 1993). "Although all elements must be proved, malice and want of probable cause constitute the gist of a malicious prosecution action." *Id.*

As explained above, Plaintiff has neither pleaded nor presented evidence of facts to demonstrate Officers Rees' or Gallegos' involvement in the prosecution of this case. Plaintiff's state-law malicious prosecution fails as a matter of law against those Defendants. As to Officer Fry, however, the same disputed issues of material fact preclude summary judgment. The "want of probable cause" and malice elements are subject to clear dispute and will require a jury to resolve them. Given the lack of any developed argument on this claim by Officer Fry beyond reiterating her probable cause arguments, the Court will allow this claim against Officer Fry to proceed to trial.

ii. **Assault and Battery**

Defendants recognize that while "a police officer making an arrest is [generally] justified in using sufficient force to subdue a prisoner, [] he becomes a tortfeasor and is liable as such for assault and battery if unnecessary violence or excessive force is used in accomplishing the arrest." *Boyles v. City of Kennewick*, 62 Wash. App. 174, 176 (1991). Defendants argue only that because they have demonstrated that the officers' uses of force were objectively reasonable, they are entitled to summary judgment on these claims as well. With regard to Officers Fry and Rees, however, the Court is unable to conclude on summary judgment whether the uses of force were objectively reasonable. Accordingly, Defendants' argument-in-passing fails and summary judgment is denied on the assault and battery claims against Officers Fry and Rees. Because the

1   Court found Officer Gallegos' use of force to be objectively reasonable as a matter of law,

2   summary judgment is granted to Officer Gallegos on Plaintiff's assault and battery claim.

3        **5.     Plaintiff's Request for Punitive Damages**

4        Defendants next argue that under the circumstances of this case, punitive damages are

5   unwarranted as a matter of law. As Defendants explain, a jury may award punitive damages "[i]f

6   the jury [finds] from a preponderance of the evidence in the case that the act or omission of the

7   defendants which proximately caused actual injury or damage to the plaintiff was maliciously or

8   wantonly or oppressively done." *Dang v. Cross*, 422 F.3d 800 (9th Cir. 2005) (citation omitted).

9   Given the factual disputes that plague this matter, the Court is not inclined to substitute its own

10  judgment for that of the jury at this stage. Plaintiff's punitive damages request will not be

11  stricken.

12  **C.     The City of Seattle's Summary Judgment Motion**

13       **1.     Plaintiff's *Monell* Claim**

14       The City of Seattle moves for summary judgment on Plaintiff's *Monell* municipal

15  liability and *respondeat superior* claims. A municipality may only be held liable for an official's

16  unconstitutional conduct under § 1983 if such conduct was caused by a City policy or custom.

17  *Mennotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (citing *Monell v. Dep't of Soc.*

18  *Servs.*, 436 U.S. 658, 691–94 (1978)). To impose liability on a local governmental entity for

19  failing to act to preserve constitutional rights—what the Ninth Circuit deems an "inaction"

20  policy claim—a section 1983 plaintiff must establish: (1) that she possessed a constitutional right

21  of which he was deprived; (2) that the municipality had a policy; (3) that this policy "amounts to

22  deliberate indifference" to the plaintiff's constitutional right; and (4) that the policy is the

23  "moving force behind the constitutional violation." *City of Canton v. Harris,* 489 U.S. 378, 389–

24  91 (1989); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012).

25       "A municipal 'policy' exists when 'a deliberate choice to follow a course of action is

26  made from among various alternatives by the official or officials responsible for establishing

ORDER
PAGE - 21

final policy with respect to the subject matter in question.'" *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)). Under governing Ninth Circuit law, there are three ways to show a policy or custom of a municipality: (1) by showing a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity"; (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision"; or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Ulrich v. City and Cty. of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002). A "policy or custom" must generally be one adopted and expressly set forth, but a municipal policy "may [also] be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Nadell v. Las Vegas Metro. Police Dep't.*, 268 F.3d 924, 929 (9th Cir. 2001).

The basis of Plaintiff's claim here has been unclear to date,[11] but Ms. Morales clarifies in her opposition brief that she believes the City of Seattle to have a policy of "allowing its officers to submit misleading and false police reports to justify arrests and uses of force when it is clear that there was no probable cause." (Dkt. No. 70 at 14.) Plaintiff argues that she has produced sufficient evidence to withstand summary judgment under the "longstanding practice or custom" test and the "delegated authority" test discussed above. The City of Seattle argues in reply that

---

[11] Plaintiff's complaint vaguely alleges that the City of Seattle, "[w]ith deliberate indifference . . . failed to take necessary, proper, or adequate measures in order to prevent the violation of plaintiff's rights." (Dkt. No. 21 at ¶ 53.) She then focuses on the lack of a policy of "corrective discipline and failure to properly train and correct[,]" but provides no allegations that are more detailed. (*Id.* at ¶ 54.) In its motion for summary judgment, the City of Seattle adduced substantial evidence of the training provided to its officers, which Plaintiff utterly fails to rebut in her opposition. Accordingly, the Court grants the City's summary judgment insofar as it relates to a failure to train or supervise. *See Marsh v. Cty. of San Diego*, 680 F.3d 1148, 1159 (9th Cir. 2012) (affirming dismissal of "failure to train" claim against municipality where plaintiff provided no evidence that training was inadequate or that additional training was necessary); *Penigar v. Cty. of San Bernadino*, --- Fed. App'x ---, 2014 WL 931098, at *1 (9th Cir. March 11, 2014) (unpublished) (affirming summary judgment for municipality where it adduced evidence that its training and supervision policies were reasonable and plaintiff failed to provide any evidence to the contrary).

1    Ms. Morales' "longstanding practice or custom" argument fails because she provides evidence of

2    only *two* examples of officers acting pursuant to the alleged policy, one of which was Ms.

3    Morales' own arrest and the other of which occurred on the same day. The City of Seattle argues

4    with regard to Ms. Morales' second assertion that only Chief Diaz had the authority to ratify the

5    officers' alleged conduct and thus create a "policy," but Ms. Morales failed to provide any

6    evidence that Chief Diaz had anything to do with the investigations. The Court addresses each

7    argument in turn.

8         Plaintiff's "longstanding policy or custom" claim cannot withstand summary judgment.

9    As Defendant points out, Ms. Morales points only to her own arrest and the arrest of one other

10   individual to demonstrate her alleged "policy or custom." But even taking these facts in the light

11   most favorable to Ms. Morales, as the Court must for purposes of Defendant's summary

12   judgment motion, two isolated examples are insufficient as a matter of law to demonstrate a

13   longstanding policy or custom that is the "standard operating procedure" of the municipality. To

14   permit such an inference to suffice would eviscerate the most basic requirement of a *Monell*

15   claim. *See*, *e.g.*, *Marsh v. Cty. of San Diego*, 680 F.3d 1148, 1159 (9th Cir. 2012) (single instance

16   of violation insufficient to constitute a "widespread practice" that would provide notice to county

17   that additional training was necessary); *Menotti*, 409 F.3d at 1151 (affirming summary judgment

18   for municipality where plaintiff provided evidence of only two allegedly unlawful searches,

19   which even in the light most favorable to plaintiff were insufficient to demonstrate a

20   "longstanding practice or custom [that] constitutes the 'standard operating procedure' of the local

21   government entity"); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper

22   custom may not be predicated on isolated or sporadic incidents; it must be founded upon

23   practices of sufficient duration, frequency and consistency that the conduct has become a

24   traditional method of carrying out policy.") Accordingly, Plaintiff's *Monell* claim against the

25

26

1    City of Seattle fails as a matter of law.[12]

2          Plaintiff's "ratification" theory similarly fails as a matter of law. To show ratification, "a

3    plaintiff must prove that the 'authorized policymakers approve[d] a subordinate's decision and

4    the basis for it." *Sheehan v. City and Cty. of San Francisco*, --- F.3d ---, 2014 WL 667082, at *15

5    (9th Cir. 2014). The Ninth Circuit has found municipal liability on the basis of ratification "when

6    the officials involved adopted and expressly approved of the acts of others who caused the

7    constitutional violation." *Id.* (quotation omitted). While unclear from her opposition, it appears

8    that Plaintiff bases her ratification theory on the argument that Officer Fry deprived her of her

9    constitutional rights but was not reprimanded or provided with additional training. Plaintiff

10   states, without supporting evidence, that "[t]he captain overruled this and declared the proper

11   course of action was to do nothing." (Dkt. No. 70 at 12.) But such attorney argument is

12   insufficient to create a genuine issue of fact, and Plaintiff nowhere provides evidence to dispute

13   Defendant's argument that Chief Diaz—the official with final-policymaking authority—did not

14   expressly adopt and approve either the officers' actions or the bases for them. Accordingly,

15   Plaintiff has failed to carry her burden on her *Monell* ratification claim. Summary judgment is

16   granted for the City of Seattle.

17          **2.     Plaintiff's *Respondeat Superior Claim***

18          Plaintiff also alleges that the City of Seattle is vicariously liable for the officers' actions

19   that violated state law. (Dkt. No. 21 at ¶¶ 78–79.) Defendant argues that summary judgment must

20   be granted on this claim because "[i]t is axiomatic that municipalities cannot be held vicariously

21   liable for their employee's actions on a theory of *respondeat superior* under 42 U.S.C. § 1983."

22   (Dkt. No. 75 at 8 (citing *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).) Defendant also

23

24          [12] The Court also finds that Plaintiff fails to adduce sufficient evidence that any alleged policy was "the
     moving force" behind the alleged constitutional violation. Because Ms. Morales points only to her own arrest and

25   one other on May Day to demonstrate the alleged policy at issue, she cannot simultaneously argue that Officer Fry
     was acting pursuant to an existing policy that caused her injuries. She offers no other argument or evidence that

26   some City of Seattle policy caused her injury. Summary judgment is thus granted to the City of Seattle on this basis
     as well.

ORDER
PAGE - 24

asserts that to the extent that it can be held vicariously liable under state law rather than under §
1983, Plaintiff's claim must fail because all of Plaintiff's underlying state law claims fail as a
matter of law. (*Id.*)

Summary judgment is denied as to Plaintiff's state law *respondeat superior* claim. It is
true that the City of Seattle cannot be held vicariously liable under § 1983, but that federal
provision is not the basis of Plaintiff's *respondeat superior* claim. Further, to the extent
Defendant suggests that summary judgment must be granted because the remainder of Plaintiff's
state law claims fail as a matter of law, the Court disagrees in light of the rulings herein. Because
no further argument was provided with regard to this claim, Plaintiff will be permitted to pursue
its state law *respondeat superior* claim at trial.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court rules as follows:

(1)   Plaintiff's motion for partial summary judgment against Officer Fry is DENIED.
(Dkt. No. 43.)

(2)   Defendants' motion for summary judgment on all claims is GRANTED IN PART
and DENIED IN PART. (Dkt. No. 55.) Specifically, summary judgment is
granted to Defendant Michelle Gallegos on Plaintiff's § 1983 claims for unlawful
arrest, malicious prosecution, and excessive force, as well as Plaintiff's state law
claim as discussed herein. Summary judgment is also granted as to Defendant
Brian Rees on Plaintiff's § 1983 claims for unlawful arrest and malicious
prosecution, as well as Plaintiff's state-law claim for malicious prosecution.
The remaining claims as discussed herein will proceed to trial.

(3)   Defendant City of Seattle's motion for summary judgment is GRANTED IN
PART and DENIED IN PART. (Dkt. No. 52.) Specifically, summary judgment is
granted to the City of Seattle on Plaintiff's § 1983 municipal liability claim.
Summary judgment is denied as to Plaintiff's state-law vicarious liability claim.

1    DATED this 25th day of March 2014.

2

3

4

5

6

7

8                                            John C. Coughenour
                                            UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER
PAGE - 26